1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

POM WONDERFUL LLC, a Delaware
limited liability company,

               Plaintiff,

      vs.

ROBERT G. HUBBARD d/b/a PUR
BEVERAGES, PORTLAND BOTTLING
COMPANY an Oregonian company, and
DOES 1-10, Inclusive,

           Defendants.

) CASE NO. CV 13-06917 MMM (CWx)
)
)
) ORDER DENYING PLAINTIFF'S MOTION
) FOR PRELIMINARY INJUNCTION
)
)
)
)
)
)
)
)
)

     Pom Wonderful LLC commenced this action against Robert G. Hubbard and Portland Bottling Company on September 19, 2013.[1] On October 11, 2013, Pom Wonderful filed a first amended complaint, alleging claims for trademark infringement under 15 U.S.C. § 1114; false designation of origin under 15 U.S.C. § 1125(a); statutory unfair competition and unfair business practices under California Business & Professions Code § 17200; and common law unfair competition.[2] On November 22, 2013, Pom Wonderful filed a motion for preliminary injunction

---

[1]Complaint, Docket No. 1 (September 19, 2013).

[2]First Amended Complaint ("FAC"), Docket No. 8 (Oct. 11, 2013).

against Hubbard based on its Lanham Act trademark infringement claim.[3]  Hubbard opposes Pom Wonderful's motion.[4]

# I. BACKGROUND

## A.    Factual Background

Pom Wonderful is allegedly the best selling brand of "super-premium" pomegranate juice in the Unites States.[5]  Since 2002, more than 190 million bottles of Pom Wonderful have been sold.[6]  The company markets its products to grocery, club, gourmet food, and other speciality stores, as well as restaurants and on-premise locations throughout the world.[7]  Pom Wonderful alleges that it produces, markets, sells, and distributes pomegranate and pomegranate-based products worldwide under the POM brand, including fresh fruit, fresh and freeze dried pomegranate arils (seeds), juices, teas, and dietary supplements.[8]  In addition to selling POM brand products, Pom Wonderful also sells ingredients to other companies in the food and beverage and dietary supplement industries for use in their products; in some instances, it licenses the use of its marks in connection with the sale of such products.[9]

Pom Wonderful markets its products under a family of trademarks that include the term

---

[3]Motion for Preliminary Injunction ("Motion"), Docket No. 21 (Nov. 22, 2013); see also Reply to Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction ("Reply"), Docket No. 33 (Dec. 20, 2013) at 10.

[4]Opposition to Motion for Preliminary Injunction ("Opposition"), Docket No. 32 (Dec. 13, 2013).

[5]FAC, ¶ 12; Declaration of Jeremy Adams ("Adams Decl."), Docket No. 21-1 (Nov. 22, 2013), ¶ 4.

[6]Adams Decl., ¶ 4.

[7]FAC, ¶ 24.

[8]Id., ¶ 1.

[9]Id., ¶ 23.

2

1   "POM" and collectively comprise the "POM Brand."[10]  The trademarks include "POM," which

2   is the subject of U.S. Trademark Registration No. 2,637,053 issued by the United States Patent

3   and Trademark Office on October 15, 2002, for use with fruit juices.[11]  Pom Wonderful contends

4   it designed its marks to be distinctive, innovative, and recognizable to consumers such that they

5   act as a source-identifier.[12]   It alleges it has invested millions of dollars in the creation,

6   development, production, marketing, and sale of products under the POM brand.[13]   Pom

7   Wonderful asserts that it devotes significant resources to developing and marketing products under

8   the POM brand; its marketing activities include sponsorship of various athletic and charitable

9   events and, beginning in late 2010, television advertising in the United States, Canada, France,

10  the United Kingdom, and the Netherlands.[14]   Pom Wonderful contends the public has come to

11  associate the POM brand with integrity, quality, purity of taste, and natural products.[15]  It asserts

12  its success is due to the quality, purity, and taste of its products, in addition to its distinctive,

13  innovative, and recognizable marks.[16]

14          Pom Wonderful alleges that Robert G. Hubbard, d/b/a Pur Beverages and Northwest

15  Beverage Distributors ("Pur"), produces, markets, and sells a line of energy drinks under the

---

17  [10]FAC, ¶¶ 10, 15.   These trademarks include POM (U.S. Trademark Registration
18  No.2,637,053); POM & Design (No. 3,047,447); POM WONDERFUL (Nos. 2,640,835 and
    3,687,491); POM WONDERFUL & Design (Nos. 2,864,641; 2,780,314; and 3,687,492); POM
19  TEA (No. 3,411,595); LIGHT POM TEA (No. 3,391,707); LIGHT POM TEA & Design (No.
    3,411,596); POM IN A PILL (No. 3,337,435); POM IN A PILL & Design (No. 3,332,875);
20  POM POWER (No. 2,944,481); POMx (Nos. 3,562,516 and 3,674,405); POMx & Design (No.
    3,562,517 and 3,791,124); POMx SHOTS (No. 3,667,882); POMX SHOTS (No. 3,667,882);
21  POWERED BY POMx (No. 3,208,934); and POMEGRANATE & Design (No. 3,436,526).

22      [11]Id., ¶ 15; id., Exh. B at 24.

23      [12]Id., ¶ 21.

24
        [13]Id., ¶ 12.
25
        [14]Id., ¶¶ 19, 25, 27.
26
        [15]Id., ¶ 13.
27
        [16]Id., ¶ 29.
28

3

"pŭr" brand, which include "pŭr renew," "pŭr revolution," "pŭr răz," and a pomegranate-flavored drink called "pŭr pŏm."[17]  Hubbard contends he began distributing pŭr pŏm in April 2013.[18]  Pom Wonderful asserts that Hubbard's use of the word "pŏm" creates a likelihood of confusion, mistake, and deception among consumers and the beverage trade regarding Pur's affiliation, connection, and/or association with Pom Wonderful.[19]  It contends Pur's use of "pŏm" threatens to undermine its goodwill and its investment in its brand.[20]

### B.   Request for Judicial Notice

Pur asks that the court take judicial notice of two documents in deciding Pom Wonderful's motion:[21] a court opinion denying Pom Wonederful's motion for preliminary injunction in another case,[22] and a Federal Trade Commission opinion dated January 10, 2013.[23]  Pom Wonderful does not oppose Pur's request.

Under Rule 201, the court can judicially notice "a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED.R.EVID. 201.  The court may take judicial notice of unpublished court opinions.  See *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record"); *Lucero v. Wong*, No. C 10–1339 SI (pr), 2011 WL 5834963, *5 (N.D. Cal. Nov. 21, 2011) ("To the extent

---

[17]Declaration of Michael M. Vasseghi ("Vasseghi Decl."), Docket No. 21-2 (Nov. 22, 2013), ¶ 4.

[18]Opposition at 2; Declaration of Robert G. Hubbard ("Hubbard Decl."), Docket No. 32-3 (Dec. 13, 2013), ¶ 2.

[19]FAC, ¶ 34.

[20]Motion at 2.

[21]Request for Judicial Notice ("RJN"), Docket No. 32-5 (Dec. 13, 2013).

[22]*Id.*, Exh. 1.

[23]*Id.*, Exh. 2.

petitioner wants the existence of published or unpublished cases judicially noticed as adjudicative facts, doing so is of very limited value because the court can take notice that such decisions exist, but the court does not take judicial notice that those decisions are correct"); *Player v. Salas*, No. 04cv1761-LAB (WMc), 2007 WL 935100, *10 (S.D. Cal. Mar. 22, 2007) ("Defendants' request that the Court take judicial notice of Defendants' Exhibit A, the unpublished opinion entitled In re MARCUS PLAYER on Habeas Corpus, is hereby GRANTED, although not for the truth of its contents"); *Toth v. Automobile Club of Cal. Long Term Disability Plan*, No. CV014653MMM (RCx), 2005 WL 1877150, *23 (C.D. Cal. Jan. 27, 2005) (taking judicial notice of unpublished district court opinions). Accordingly, the court takes judicial notice of the court opinion, but not of the truth of its contents.

Courts may also take judicial notice of documents generated by the Federal Trade Commission because they are public records. See *Romine v. Diversified Collection Services, Inc.*, 155 F.3d 1142, 1146 (9th Cir. 1998) (taking judicial notice of a Federal Trade Commission letter); *Free FreeHand Corp. v. Adobe Systems Inc.*, 852 F.Supp.2d 1171, 1177 (N.D. Cal. 2012) (taking judicial notice of a Federal Trade Commission consent order). The court thus takes judicial notice of the Federal Trade Commission opinion. Having granted Pur's requests for judicial notice, the court will consider the judicially noticed documents in deciding Pom Wonderful's motion.

## II. DISCUSSION

### A.   Standard Governing Motions for Preliminary Injunctions

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). Thus, a district court should enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Such a showing requires that the plaintiff establish it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; see *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021

(9th Cir. 2009) ("Under *Winter*, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest"); see also *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir. 2009) ("[P]reliminary injunctive relief is available only if plaintiffs [also] 'demonstrate that irreparable injury is likely in the absence of an injunction,'" quoting *Winter*, 555 U.S. 22);[24] *American Trucking Associations*, 559 F.3d at 1052 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits," citing *Winter*, 555 U.S. at 20); *Timbisha Shoshone Tribe v. Kennedy*, 687 F.Supp.2d 1171, 1182 (E.D. Cal. 2009) ("Pursuant to *Winter*, [p]laintiffs must make a 'clear showing' that they are 'likely to succeed on the merits,'" quoting *Winter*, 555 U.S. at 22).

Following *Winter*, the Ninth Circuit articulated an alternate formulation of the sliding scale test, under which serious questions going to the merits and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if plaintiff shows there is a likelihood of irreparable injury and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("To the extent prior cases applying

---

[24] Prior to the Supreme Court's decision in *Winter*, the Ninth Circuit held that to prevail on a motion for preliminary injunction, a plaintiff had to demonstrate:

> "either: (1) a likelihood of success on the merits and the *possibility* of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be shown." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Clear Channel Outdoor Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003) (emphasis original)).

The *Winter* Court "definitively refuted" the Ninth Circuit's "possibility of irreparable injury" standard. *Id*. It held that the "'possibility' standard [was] too lenient," and that "plaintiffs seeking preliminary relief [have] to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis original). Following *Winter*, the Ninth Circuit has held that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (footnote omitted).

the 'serious questions' test have held that a preliminary injunction may issue where the plaintiff shows only that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor, without satisfying the other two prongs, they are superseded by *Winter*, which requires the plaintiff to make a showing on all four prongs. . . . But the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test. That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest").

If the harm to the plaintiff is merely monetary, it "will not usually support injunctive relief." *American Trucking Associations*, 559 F.3d at 1057. See also *California Pharmacists Association v. Maxwell-Jolly*, 563 F.3d 847, 851-52 (9th Cir. 2009) ("Typically, monetary harm does not constitute irreparable harm. . . . Economic damages are not traditionally considered irreparable because the injury *can later be remedied by a damage award*" (emphasis original)). In addition, harm that is "merely speculative" will not support injunctive relief, "although a loss of goodwill and reputation can do so." *American Trucking Associations*, 559 F.3d at 1057.

As the *Winter* Court noted, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 55. "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).[25]

"The plaintiff[ ] bear[s] the initial burden of showing that [issuance of an] injunction is in the public interest." *Stormans*, 586 F.3d at 1139 (citing *Winter*, 555 U.S. 27). The district court,

---

[25]The *Winter* Court stated that "'*consideration of the public interest*' is mandatory 'in assessing the propriety of any injunctive relief.'" *Nelson v. National Aeronautics and Space Administration*, 568 F.3d 1028, 1050 (9th Cir. 2009) (Kleinfeld, J., dissenting from denial of rehearing en banc) (quoting *Winter*, 555 U.S. at 32 (emphasis original)).

however, "need not consider public consequences that are 'highly speculative.'" *Id.* (quoting *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008)). "In other words, the court should weigh the public interest in light of the likely consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence." *Id.* "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Stormans*, 586 F.3d at 1138-39 (quoting *Bernhardt v. L.A. County*, 339 F.3d 920, 931 (9th Cir. 2003)). "If, however, the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id.* at 1139 (citing *Sammartano v. First Judicial District Court*, 303 F.3d 959, 965 (9th Cir. 2002)). See also *Sierra Forest Legacy*, 577 F.3d at 1022 ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction"). "[When] an injunction is asked which will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger*, 456 U.S. at 312-13.

As a threshold matter under *Winter*, the moving party must establish a likelihood of success on the merits of its claims before a court can grant a preliminary injunction. *Winter*, 555 U.S. at 20. As noted, in the Ninth Circuit, this threshold showing can be made by demonstrating that there are serious questions going to the merits of the claims. If the moving party is unable to establish this element, the request for a preliminary injunction must be denied and the court need not review whether the remaining requirements for a preliminary injunction are satisfied. See *Dudum v. City and County of San Francisco*, Case No. 10-00504-RS, 2010 WL 1532365, *11 (N.D. Cal. Apr. 16, 2010); *Jones v. Felker*, Case No. 08-006-FCD-EFB, 2010 WL 582131, *2

(E.D. Cal. Feb. 12, 2010).[26]

**B.     Pom Wonderful's Likelihood of Success on the Merits on its Trademark Infringement Claim**

Trademarks represent "a limited property right in a particular word, phrase, or symbol." *New Kids on the Block v. New American Publishing, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992). To prevail on a trademark infringement claim, a plaintiff must prove "(1) that it has a protectible ownership interest in [a] mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the [plaintiff's] rights to the mark." *Department of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc)).

**1.     Ownership and Validity**

Under 15 U.S.C. § 1115(a), registration of a mark is "prima facie evidence of the validity of the registered mark[,] . . . of the registrant's ownership of the mark, and . . . [of the] exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration." 15 U.S.C. § 1115(a); *Brookfield Communication, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) (plaintiff's "registration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of [plaintiff's] exclusive right to use the mark on the goods and services specified in the registration"). Where a plaintiff adduces proof of registration,

---

[26]After *Winter*, a district court cannot take an "an all-or-nothing approach to assessing the harms." *Sierra Forest Legacy*, 577 F.3d at 1022. Instead, the court must "address[ ] the options actually on the table." *Id.* In *Winter*, this meant addressing whether, given the fact that four restrictions on defendant's conduct were already in place, irreparable injury was likely to occur absent an injunction that included two additional restrictions. *Winter*, 129 S.Ct. at 376. In *Sierra Forest Legacy*, the Ninth Circuit reversed the district court's application of the non-merits injunctive relief factors that "boiled down to a choice between" allowing the Forest Service to move ahead with a framework developed in 2004 or requiring the Forest Service to take no action at all with respect to fire prevention. The Ninth Circuit held that the district court erred by failing to consider whether a narrower injunction, such as one allowing the Forest Service to proceed under an unchallenged framework developed in 2001, would have served to prevent otherwise likely irreparable injury. *Sierra Forest Legacy*, 577 F.3d at 1022-23.

the burden shifts to the defendant to rebut the presumption of ownership.  See, e.g., *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use.  To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services. . . .  When proving ownership of a trademark, federal registration of the mark is prima facie evidence that the registrant is the owner of the mark.  Therefore, the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence" (citation omitted)).

Pom Wonderful contends that it has used the "POM" mark since 2001.[27]  Additionally, it has attached as an exhibit to its amended complaint a copy of the federal trademark registration it obtained for the "POM" mark in 2002.[28]  The registration gives rise to a presumption of ownership and validity.  Because Pur has not attempted to rebut the presumption, the court concludes that Pom Wonderful has established that it is likely to prove the first element of its trademark infringement claim.

## 2.    Likelihood of Confusion

"The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Production Group, Inc. v. SKG Studio, d/b/a Dreamworks SKG*, 142 F.3d 1127, 1129 (9th Cir. 1998) (footnote omitted).  The Ninth Circuit has identified eight factors that should be considered in making this assessment: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning;

---

[27]Motion at 3.

[28]*Id.*, Exh. A at 6.  Because the mark was registered more than five years ago, it is "incontestable" under the Lanham Act.  *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988), abrogated on other grounds in *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985) (en banc).

(4) evidence of actual confusion; (5) the degree to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers are likely to exercise in purchasing them; (7) evidence of defendants' intention in selecting and using the allegedly infringing mark; and (8) the likelihood that the parties will expand their product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979); see also *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (reciting the *Sleekcraft* factors).

"The[se] factors should not be rigidly weighed." *Dreamwerks Production Group*, 142 F.3d at 1129. Rather, they "are intended to guide the court in assessing the basic question of likelihood of confusion." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992). The court need not address all of the factors, nor must plaintiff establish that each weighs in its favor to show likelihood of confusion. See *C & C Org. v. AGDS, Inc.*, 676 F.Supp. 204, 206 (C.D. Cal. 1987) (citing *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 526 (9th Cir. 1984)). Indeed, some *Sleekcraft* factors are more important in certain contexts than others. See, e.g., *Brookfield Communications, Inc.*, 174 F.3d at 1054 ("A word of caution: this eight-factor test for likelihood of confusion is pliant. Some factors are much more important than others, and the relative importance of each individual factor will be case-specific. Although some factors – such as the similarity of the marks and whether the two companies are direct competitors – will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors"); *Dreamwerks Production Group*, 142 F.3d at 1130 & n. 6 (noting that three of the *Sleekcraft* factors were "pivotal" and that the remainder did not "provide much insight in this case and thus carr[ied] little weight").

"[A]t the preliminary injunction stage, 'the trial court is not required to consider all of th[e] factors' since the record will not likely be sufficient to permit thorough consideration." *Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F.Supp.2d 976, 984 (N.D. Cal. 1999) (quoting *Apple Computer*, 725 F.2d at 526). Rather, a plaintiff need only "establish that it is likely to be able to show such a likelihood of confusion." *Brookfield Communications*, 174 F.3d at 1052 n. 15.

a.     **Strength of the Mark**

i.     **Distinctiveness**

"The strength of a given mark rests on its distinctiveness." *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988), abrogated on other grounds in *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 (9th Cir. 1985) (en banc).  A "mark's strength can be measured in terms of its location along a continuum stretching from arbitrary, inherently strong marks, to suggestive marks, to descriptive marks, to generic, inherently weak marks." *Id.* at 1448 (quoting *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987)); see *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1080 (9th Cir. 2005) ("A generic mark is the least distinctive, and an arbitrary or fanciful mark is the most distinctive," citing *GoTo.com*, 202 F.3d at 1207), cert. denied, 547 U.S. 1069 (2006); *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 872 (9th Cir. 2002) (noting that trademarks fall into one of four categories of distinctiveness: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful).

Generic terms cannot be protected as trademarks because "they are common words or phrases that 'describe a class of goods rather than an individual product,'" and thus do not relate exclusively to the product of the trademark owner. *Japan Telecom*, 287 F.3d at 872 (citing *New Kids on the Block*, 971 F.2d at 306).  Descriptive terms "suffer from the same problem." *Id.* Descriptive terms relate more directly to a particular product than do generic terms, as they "describe[ ] a person, a place or an attribute of [the] product."  They will not support the grant of an exclusive property right, however, "[b]ecause they tend to consist of common words that might be the only way to describe a category of goods." *Id.*; see also *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir. 1998) ("Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood").

Terms that are suggestive, or arbitrary and fanciful, by contrast, are inherently distinctive, and protectable as trademarks. *Japan Telecom*, 287 F.3d at 872 (noting that such terms are protectable "without a showing of secondary meaning").  A suggestive mark "conveys an

impression of a good [or service] but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature." *Brookfield Communications,* 174 F.3d at 1058 n. 19 (citing "Roach Motel" insect traps as an example); see also *Kendall-Jackson Winery*, 150 F.3d at 1047 n. 8 (a suggestive mark is one for which "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, [because] the mark does not *describe* the product's features, but *suggests* them" (emphasis original)).   Arbitrary and fanciful marks "have no intrinsic connection to the product with which the mark is used; [arbitrary marks] consist[ ] of words commonly used in the English language [e.g. 'Black & White' scotch whiskey], whereas [fanciful marks] are wholly made-up terms [e.g. 'Clorox' bleach]." *Brookfield Communications*, 174 F.3d at 1058 n. 19 (citations omitted).

When a mark is registered, the registration carries with it a presumption that the mark has acquired secondary meaning and is not generic.  See *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005) ("Federal registration of a trademark endows it with a strong presumption of validity.  The general presumption of validity resulting from federal registration includes the specific presumption that the trademark is not generic," quoting *Coca–Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1254 (9th Cir. 1982)); see also *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir. 1992) ("We believe . . . that the district court gave insufficient weight to the presumptive effect of Amtra's federal registration.   As applied to a descriptive mark such as Amtra's, the registration carries a presumption of secondary meaning," citing *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered  trademarks are presumed to be distinctive and should be afforded the utmost protection"); 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:11, at 687 (2d ed. 1984)).  This presumption can be rebutted by a preponderance of the evidence showing that the mark is not protectable.  See *555-1212.com, Inc. v. Communication House Int'l, Inc.*, 157 F.Supp.2d 1084, 1089 (N.D. Cal. 2001) (citing *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769 (9th Cir. 1981)).  As noted, Pom Wonderful has registered twenty-one marks protecting variations of the "POM" name.  Because these marks are registered, they are presumed, even if descriptive, to have secondary meaning.

Moreover, five of the marks were registered more than five years ago, making them incontestable. See *Miss World (UK) Ltd.*, 856 F.2d at 1448 ("[R]egistration [of the marks more than five years ago] makes the mark[s] 'incontestable' under the Lanham Act," citing 15 U.S.C. §§ 1065, 1115(b)) and *Park 'N Fly, Inc.*, 469 U.S. at 194). "Incontestable status provides the trademark with a conclusive presumption of validity and prevents a defense to infringement on the grounds that the mark is merely descriptive." *Chrysler Corp. v. Vanzant*, 124 F.3d 210, 1997 WL 547993, *3 (9th Cir. Aug. 28, 1997) (Unpub. Disp.); *Miss World (UK) Ltd.*, 856 F.2d at 1448 n. 4 (stating that incontestable marks are "conclusively presumed to have secondary meaning"); see also *KP Permanent Make-Up, Inc.*, 408 F.3d at 606 ("A descriptive mark that has become incontestable is conclusively presumed to have acquired secondary meaning. This means that a defendant in a trademark infringement action cannot assert that an incontestable mark is invalid because it is descriptive and lacks secondary meaning," citing *Park 'N Fly, Inc.*, 469 U.S. at 205); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n. 3 (9th Cir. 2002). Since Pom Wonderful registered the "POM" mark nine years ago, the mark is incontestable and cannot be challenged on the basis that it is merely descriptive.[29]

---

[29]Pur can challenge an incontestable mark only on certain enumerated statutory grounds. See 15 U.S.C. § 1115(b) ("To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. Such conclusive evidence shall relate to the exclusive right to use the mark on or in connection with the goods or services specified in the affidavit filed under the provisions of section 1065 of this title, or in the renewal application filed under the provisions of section 1059 of this title if the goods or services specified in the renewal are fewer in number, subject to any conditions or limitations in the registration or in such affidavit or renewal application. Such conclusive evidence of the right to use the registered mark shall be subject to proof of infringement as defined in section 1114 of this title, and shall be subject to the following defenses or defects: (1) That the registration or the incontestable right to use the mark was obtained fraudulently; or (2) That the mark has been abandoned by the registrant; or (3) That the registered mark is being used by or with the permission of the registrant or a person in privity with the registrant, so as to misrepresent the source of the goods or services on or in connection with which the mark is used; or (4) That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity

Pur argues the word mark "POM" has nonetheless become generic and is thus unprotectable.[30]  "An incontestable mark that becomes generic may be canceled at any time pursuant to § 14(c) [of the Lanham Act, 15 U.S.C. § 1064]."  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 195 (1985); see also  *KP Permanent Make-Up, Inc.*, 408 F.3d at 602-03 ("'Generic terms are not registrable, and a registered mark may be canceled at any time on the grounds that it has become generic.'. . .  An incontestable registration . . . does not apply to a mark that is generic," quoting *Park 'N Fly, Inc.*, 469 U.S. at 194); *Green Products Co. v. Black Flag Brands LLC*, No. C–10–2121 (JCS), 2010 WL 3910336, *3 (N.D. Cal. Oct. 4, 2010) ("[A] trademark can be attacked on the grounds that it is generic regardless of whether the mark has attained a presumption of validity"); 3 J. Thomas McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:56 (4th ed. 2013) ("A registration can be canceled at any time if the registered mark "'becomes the generic name for the goods or services, or a portion thereof, for which it is registered,'" quoting 15 U.S.C. § 1064(3)).

"To determine whether a term has become generic, we look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer

---

with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin; or (5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to (A) the date of constructive use of the mark established pursuant to section 1057(c) of this title, (B) the registration of the mark under this chapter if the application for registration is filed before the effective date of the Trademark Law Revision Act of 1988, or (C) publication of the registered mark under subsection (c) of section 1062 of this title: Provided, however, That this defense or defect shall apply only for the area in which such continuous prior use is proved; or (6) That the mark whose use is charged as an infringement was registered and used prior to the registration under this chapter or publication under subsection (c) of section 1062 of this title of the registered mark of the registrant, and not abandoned: Provided, however, That this defense or defect shall apply only for the area in which the mark was used prior to such registration or such publication of the registrant's mark; or (7) That the mark has been or is being used to violate the antitrust laws of the United States; or (8) That the mark is functional; or (9) That equitable principles, including laches, estoppel, and acquiescence, are applicable").

[30]Opposition at 6.

understands the word to refer to the goods themselves. If the buyer understands the word to refer to the source of the goods, the term is not generic. However, if the disputed term is identified with all such goods or services, regardless of their suppliers, it is generic." *KP Permanent Make-Up, Inc.*, 408 F.3d at 604 (internal quotation and citation omitted). Where, as here, the trademarks have been federally registered, the party asserting that the mark has become generic bears the burden of proof. *Id.* at 604; *Green Products Co.*, 2010 WL 3910336 at *3. Courts determining whether a mark is generic can place "significant" weight on dictionary definitions. *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1148 (9th Cir. 1999) ("[W]hile not determinative, dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public, the ultimate test of whether a trademark is generic")).

As evidence that "pom" is generic, Pur cites the "Urban Dictionary," which defines "pom" as "prisoner of mother England," "pomigranate" [sic], a British person, and "hot girls."[31] The "Urban Dictionary" is a website that allows users to publish their own definitions of words with limited editorial oversight. *Toye v. New York State Dept. of Corrections and Community Supervision*, No. 1:13–CV–414, 2013 6579033, *2 n. 4 (N.D.N.Y. Dec. 13, 2013). The court gives the Urban Dictionary definition little weight, particularly because Pur does not cite other, more conventional, dictionaries that define "pom" as pomegranate. Compare *Filipino Yellow Pages, Inc.*, 198 F.3d at 1147 (citing, in analyzing whether a trademark was generic, Webster's Ninth New Collegiate Dictionary); *Surgicenters of America, Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1015 (9th Cir. 1979) (citing, in analyzing whether a trademark was generic, the Fund & Wagnalls New Standard Dictionary and Webster's Third New International Dictionary).

Pur also asserts that "a substantial variety of competitors in the beverage industry routinely

---

[31]Opposition at 7; Declaration of Heather L. McCloskey ("McCloskey Decl."), Docket 32-1 (Dec. 13, 2013), Exh. W.

16

market their pomegranate-flavored beverages as 'pom.'"[32]  It proffers twenty-one Internet search results purportedly showing that "pom" is used to describe the type and flavor of a beverage, rather than the producer of the beverage.[33]  Although Pur has adduced some evidence that purveyors of pomegranate-flavored beverages use "pom" to describe their products, it has fallen short of demonstrating that "the disputed term is identified with all such goods or services, regardless of their suppliers."  *KP Permanent Make-Up, Inc.*, 408 F.3d at 604.  First, Pur has adduced no direct evidence regarding *consumers'* perceptions of the term.  *Id.*  Its proof regarding purveyors' use of "pom" is also inadequate because it proffers no evidence of the volume of sales made by any of the companies it identifies, their respective market shares, or the perceptions of consumers who allegedly purchase their products.  Moreover, several products Pur identifies, such as sunscreen, electronic cigarettes, and alcoholic beverages, do not appear to compete directly with Pom Wonderful's products.  Compare *Closed Loop Marketing, Inc. v. Closed Loop Marketing, LLC*, 589 F.Supp.2d 1211, 1219 n. 6 (E.D. Cal. 2008) ("Significant use of a term by *competitors* in the industry has traditionally been recognized . . . as indicating genericness," quoting *Mil–Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1159 (7th Cir. 1996) (emphasis added)).

Pom Wonderful, moreover, counters that it is "vigilant[,] . . . actively monitors any use" of the "POM" mark, and takes "appropriate enforcement action" whenever it discovers such use to ensure that its trademarks remain protected.[34]  Pom Wonderful's counsel notes that her firm has sent at least seventy-five cease and desist letters in the past three and a half years to entities using

---

[32]Opposition at 7.

[33]*Id.* at 8.  As Pom Wonderful notes, however, two of the search results concern a single company, while several others are recipes that appear unrelated to any product offered for sale, including one recipe calling for use of POM brand pomegranate juice.  (Reply at 7 n. 3, 8.)

[34]Reply at 7; Declaration of Danielle M. Criona ("Criona Decl."), Docket No. 33-2 (Dec. 20, 2013), ¶ 3.

"POM."[35]  Furthermore, Pom Wonderful represents that only two of the companies Pur identifies are actual competitors, and that both have agreed to discontinue their use of "POM."[36]  Pom Wonderful's efforts to police use of the trademark, and the fact that it has had some success in doing so, is probative of the fact that the trademark is not generic.  See *Walker v. Klein*, No. 87-1322-IEG (CGA), 1998 WL 35304733, *6 (S.D. Cal. Apr. 3, 1998) (stating that unchallenged use of a term by competitors is probative of the generic nature of a trademark).  Consequently, the court is unable to conclude that Pur has carried its burden of demonstrating that "pom" is generic.

Pur also argues that "POM" is generic under *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137 (2d Cir. 1997).  In *Genesee Brewing*, the Second Circuit held the term "honey brown," which was not a registered trademark, was generic as applied to ales, because the words were necessary to describe a beer in the traditional category of "brown ale" that is brewed with the addition of honey.  *Id.* at 140-41.  *Genesee* is distinguishable.  In contrast to "honey brown," Pom Wonderful's trademark is registered, which carries with it a presumption of validity.  More importantly, unlike "honey brown," "Pom" is not necessary to describe a pomegranate-based or pomegranate-flavored  product, because such products can accurately be described by using the word "pomegranate."

On the limited present record, therefore  the court concludes that Pom Wonderful is likely to show that "POM" is not generic and is thus protectable.  Having reached this conclusion, the court evaluates the conceptual strength of the mark.

Pur acknowledges that several of Pom Wonderful's marks are incontestable, but nonetheless asserts that "POM" is merely descriptive.[37]  It argues the mark's incontestable status does not foreclose challenges to the strength of the mark and, hence, the scope of the protection it affords relative to products such as energy drinks that do not fall within the ambit of the

---

[35]Criona Decl., ¶ 4.

[36]*Id.*, ¶ 5; Motion at 8-9.

[37]Opposition at 12-13.

registration.[38]  Pur cites *In re Loew's Theaters, Inc.*, 769 F.2d 764 (Fed Cir. 1985), *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 828 F.2d 1567 (Fed. Cir. 1987), and *In re The Outdoor Recreation Group*, SERIAL 76570321, 2006 WL 3616347 (TTAB 2006), as support for this proposition.  As Pom Wonderful correctly notes,[39] however, each of these cases is inapposite. In *Merrill Lynch*, the court rejected an argument that the owner of an incontestable mark had an automatic right to register the mark for another type of service.  828 F.2d at 1568-69 ("*In Park 'N Fly, Inc.* the Supreme Court held that an action for infringement of a registered mark that has become incontestable can not be defended on the ground that the mark is 'merely descriptive.' This holding is not pertinent to appellant's argument concerning registration of the same mark for a broadened class of goods. . . .   While 'ownership of one or more prior registrations on the Principal Register . . . of the same mark may be accepted as prima facie evidence of distinctiveness,' 37 C.F.R. 2.41(b), ownership of a registration does not of itself authorize the grant of another registration for different goods.  Each application for registration must be considered on its own merits").  Pom Wonderful, however, does not seek to register the "POM" mark for additional goods; rather it argues that Pur's use of "pŏm" infringes its existing mark.

In both *Loews Theaters* and *The Outdoor Recreation Group*, the owner of an incontestable mark sought to register a similar but *separate* mark for additional goods.  See *Loew's Theaters*, 769 F.2d at 769 ("LTI argues that, as the owner of an 'incontestible' registration for virtually the identical mark for closely related goods, i.e., DURANGOS for cigars, registration of the subject mark is mandated.  Since LTI's existing registration and exclusive right to use the registered mark cannot be challenged under § 2(e)(2) as misdescriptive, LTI reasons that its application for DURANGO for chewing tobacco is also not subject to question on that ground.  Support for this analysis is purportedly found in the recent decision of the Supreme Court in *Park 'N Fly [Inc.]*. . . .  In the *Park 'N Fly* case, an attack based on the alleged descriptiveness of a registered mark was declared to be contrary to the 'incontestability' rights which had accrued to the registrant upon

---

[38]*Id.*

[39]Reply at 12-14 & n. 6.

compliance with the relevant conditions of the statute after registration. LTI argues that the subject refusal of registration is a comparable attack on LTI's rights arising from its existing registration and that the board's holding must, therefore, be overturned. We disagree. LTI's existing rights arising from its registration of DURANGOS for cigars are unaffected by the ruling with respect to the subject application. Thus, the PTO's action here is not constrained by the *Park 'N Fly* decision"); *Outdoor Recreation Group*, 2006 WL 3616347 at *7 ("Nor are we persuaded that the examining attorney's present refusal to register constitutes an impermissible collateral attack on applicant's prior, incontestable, Registration No. 1472288. We note initially that even if incontestability could limit an examining attorney's ability to refuse registration, it would not preclude a genericness refusal, which is always available as a ground for cancellation of an incontestable registration. Section 14(3) of the Act specifically permits a challenge to such a mark based on genericness. . . . Further, and as noted above, the mark in Registration No. 1472288 differs from the proposed mark, OUTDOOR PRODUCTS, in the involved application in that applicant's prior registered mark appears in stylized form, incorporating a design as part of the letter 'O' and an oval carrier. In addition, the involved application recites goods that are not included among the goods identified in applicant's prior, incontestable, registration. It is settled that a registered mark is incontestable only in the form registered and for the goods or services claimed. A registered mark on goods other than those previously registered carries no presumption of distinctiveness. It is further settled that ownership of an incontestable registration does not give the applicant a right to register the same or similar mark for different goods or services, even if they are closely related to the goods or services set forth in the incontestable registration. [E]ach application for registration of a mark for particular goods must be separately evaluated" (internal quotation marks and citations omitted)).

Despite its distinguishable citations, however, Pur's argument has some merit. Even though the marks' incontestable status means they are "conclusively presumed to have secondary

meaning,"[40] *Miss World (UK) Ltd.*, 856 F.2d at 1448 n. 4, this "does not establish . . . that [they are] . . . particularly strong mark[s]," *id.* at 1449.  See *id.* ("Miss World Ltd. argues, however, that its mark is strong because it is incontestable.  The conclusion does not follow.  The district court decided that although the mark was incontestable it was weak").  As the *Miss World* court explained, registration simply means that the mark has achieved some degree of secondary meaning, i.e., "consumer[ ] mental association of the mark with the source of the product." *Id.* at 1448 n. 4.  Whether the mark is strong is another matter.  See *id.* at 1449 ("[A]n incontestable status does not alone establish a strong mark").  See also *Sleekcraft*, 599 F.2d at 349 n. 12 ("Once secondary meaning is established, though, the protection afforded should be commensurate with the degree of consumer association proven" (citation omitted)).  Rather, to determine the strength of plaintiffs' marks, the court must first decide where on the distinctiveness spectrum they fall – i.e., whether they are descriptive, suggestive, or arbitrary.

Citing *Park 'N Fly, Inc.* and *Entrepreneur Media*, Pom Wonderful argues that an incontestable mark cannot be found to be descriptive as a matter of law.[41]  Pom Wonderful misstates the holding of these cases.  Both held that an incontestable trademark could not be deemed unenforceable on the ground that it is descriptive and lacks secondary meaning, because a descriptive mark cannot be registered unless it has secondary meaning.  See *Park 'N Fly, Inc.*, 469 U.S. at 200 ("[A] merely descriptive mark cannot be registered unless the Commissioner

---

[40]"Secondary meaning refers to a mark's actual ability to trigger in consumers' minds a link between a product or service and the source of that product or service.  That is, a mark has secondary meaning 'when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself.'" *Grupo Gigante SA De CV v. Dallo & Co.*, Inc., 391 F.3d 1088, 1095 (9th Cir. 2004) (quoting *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000)).  "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages, Inc.*, 198 F.3d at 1151 (citing 2 T. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 15:30).

[41]Reply at 12-13.

finds that it has secondary meaning"); *Entrepreneur Media, Inc.*, 279 F.3d at 1142 n. 3 ("A descriptive mark is entitled to trademark protection only if 'it has acquired secondary meaning,'" quoting *Park 'N Fly, Inc.*, 469 U.S. at 194); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:44 (4th ed. 2013) ("Defendant faced with an incontestable registered mark cannot defend by claiming that the mark is invalid because it is descriptive and lacks secondary meaning. This rule was made clear by the U.S. Supreme Court in its 1985 *Park 'N Fly* decision"). Nonetheless, the *Entrepreneur Media* court held that it is appropriate to assess the strength of an incontestable mark because its strength may be relevant in determining the likelihood of consumer confusion. See 279 F.3d at 1142 n. 3 ("The distinction [between descriptive and suggestive] has little relevance here, however, because the incontestable status of EMI's mark serves as conclusive proof that the mark has secondary meaning. Smith cannot, therefore, defend on the ground that EMI's mark is descriptive and without secondary meaning, and thus entitled to no trademark protection at all. We note that, although determining whether EMI's mark is descriptive or suggestive does not affect whether EMI must prove secondary meaning, the relative strength or weakness of EMI's mark does affect whether a consumer would likely be confused by the marks Smith uses. Moreover, the incontestable status of EMI's mark does not require a finding that the mark is strong").

In the Ninth Circuit, courts apply the "imagination test" and the "need test" to determine the strength of a trademark. *Miss World (UK) Ltd.*, 856 F.2d at 1449 (citing *Rodeo Collection*, 812 F.2d at 1218). "The 'imagination test' asks how much imagination a consumer must use to associate a given mark with the goods or services it identifies. . . . The more imagination required, the stronger the mark is." *Id.*; see *Rodeo Collection*, 812 F.2d at 1218. "The 'need test' approaches the problem from the opposite end. It asks to what extent a mark is actually needed by competitors to identify their goods or services." *Miss World (UK) Ltd.*, 856 F.2d at 1449; *Rodeo Collection*, 812 F.2d at 1218. "'[If] the suggestion made by the mark [is] so remote and subtle that it is really not likely to be needed by competitive sellers to describe their goods [or services] . . . this tends to indicate that the mark is merely suggestive, not descriptive. If, however, the message conveyed by the mark about the goods or services is so direct and clear that

competing sellers would be likely to [need to] use the term in describing or advertising their goods [or services], then this indicates that the mark is descriptive.'" *Rodeo Collection*, 812 F.2d at 1218 (quoting 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 11:21 (2d ed. 1984)).

Pom Wonderful asserts that "POM" is suggestive.[42]  It contends the term is not an abbreviation of "pomegranate" and has no independent meaning,[43] and that it is unnecessary for competitors to use the term to identify their pomegranate-flavored goods because they can simply use "pomegranate" instead.[44]  The court accepts these arguments.  As noted, conventional dictionaries such as Merriam-Webster do not define "pom" as a standard abbreviation of "pomegranate."  Because "POM" has no independent pomegranate-related meaning recognized by conventional dictionaries, it cannot be said to define a quality or characteristic of a pomegranate-flavored drink.  Moreover, although "pom" is the first syllable of "pomegranate," it is also the first syllable of other multisyllabic words, such as "Pomeranian," as well as other comestibles such as the pomelo and pomfret.  Thus, "Pom" is not a straightforward abbreviation of "pomegranate," but requires some additional reasoning to decipher its reference.  The court therefore concludes the term is likely not descriptive, but suggestive.  See *Kendall-Jackson Winery, Ltd.*, 150 F.3d at 1047 n. 8 ("Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood. . . .  If a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, then the mark does not describe the product's features, but suggests them.  Such a mark is therefore classified as 'suggestive' rather than 'descriptive'").  For purposes of this preliminary proceeding, therefore, the court concludes that the mark is conceptually strong.

### ii.    Commercial Strength

"'Placement on the spectrum of distinctiveness does not end the enquiry as to the strength

---

[42]Motion at 13.

[43]*Id.* at 1, 6.

[44]*Id.* at 2.

23

of a mark: it is only the first step.  The second step is to determine the strength of th[e] mark in the marketplace[,] [t]hat is, its degree of recognition in the minds of the relevant customer class.'" *Miss World (UK) Ltd.*, 856 F.2d at 1449 (quoting 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:1 (2d ed. 1984)); see also *Petro Shopping Centers v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir.) (". . . the placement of a mark in either the suggestive or descriptive category is merely the first step in assessing the strength of a mark for purposes of likelihood of confusion test. . . .  [C]ourts must examine, in addition to the mark's characterization as suggestive or descriptive, the extent of secondary meaning a mark has acquired in the eyes of consumers"); *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 479 (3d Cir. 1994) ("Distinctiveness on the scale of trademarks is one measure of a mark's strength. . . .  Commercial strength, or marketplace recognition of the mark, is another"); *John J. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983) (the distinctiveness of the mark and the extent of third party use "both . . . should be considered when analyzing the strength of a particular trademark"); *Sun Banks of Florida, Inc. v. Sun Fed. Savings & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981) (after holding that plaintiff's mark was arbitrary, the court stated: "The ultimate strength of a mark, the key inquiry before us, is determined by a number of factors which establish its standing in the marketplace"); 2 J. Thomas McCarthy MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11.83 (4th ed. 2013)("While some courts have made the strong-weak evaluation solely upon the place of a term on the spectrum of marks, such an approach is incomplete.  One must in addition look at the marketplace strength of the mark at the time of the litigation or at the time registration is sought").  The Ninth Circuit has stated that if a mark is conceptually distinctive, a lack of commercial strength cannot diminish the mark's overall strength.  See *M2 Software, Inc.*, 421 F.3d at 1081 ("[W]e have never held that an arbitrary or fanciful mark (i.e., a conceptually strong mark) can have its overall strength diminished by feeble commercial success.  We decline to do so today. . . .  [W]e hold that a lack of commercial strength cannot diminish the overall strength of a conceptually strong mark so as to render it undeserving of protection").

Pom Wonderful has proffered evidence that its POM brand of pomegranate juice is the

national leader in supermarket sales in its market segment of 100% pomegranate juices, and is also the leading seller in Los Angeles, Chicago, New York, Boston, Atlanta, Dallas, Pittsburgh, and Charlotte.[45] Pom Wonderful has sold more than 190 million bottles of the juice since 2002.[46] It represents that it has spent tens of millions of dollars in the United States on the marketing and sale of its products,[47] including more than $24 million in 2011 and 2012 alone.[48] Pom Wonderful has sponsored various charitable and "healthy life-style" events that feature its pomegranate juice; in 2010, it began a television advertising campaign for the juice in the United States, Canada, France, the United Kingdom, and the Netherlands.[49]   As further evidence of the mark's commercial strength, Pom Wonderful touts its receipt of various industry awards in 2005, including the Company of the Year Award at an industry trade show called The Beverage Forum, and "best health beverage" in Reader's Digest annual "America's 100 Best" awards.[50]

This evidence, which is uncontroverted, suffices to show demonstrate that Pom Wonderful is commercially strong.   Morever, Pur has adduced no evidence that the Pom mark is not commercially strong.   Although it has proffered some evidence of third-party use of the mark, it has adduced no evidence of the scope of third-party use measured by revenue, sales volume, or market share.   Consequently, Pom Wonderful is likely to prove the mark is commercially strong.

---

[45]*Id.* at 4; Adams Decl., ¶ 4.

[46]Motion at 4; Adams Decl., ¶ 4.

[47]Motion at 6.

[48]Motion at 7; Adams Decl., ¶ 15.

[49]Motion at 7; Adams Decl., ¶¶ 7-8.

[50]Motion at 7; Adams Decl., ¶¶ 11-12.

1

### b.      Proximity or Relatedness of the Goods

2    Goods are proximate or related if they "are similar in use and function," and "would be

3 reasonably thought by the buying public to come from the same source if sold under the same

4 mark.'" *Sleekcraft*, 599 F.2d at 348 n. 10, 350 (quoting *Standard Brands, Inc. v. Smidler*, 151

5 F.2d 34, 37 (2d Cir. 1945)); *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149,

6 159 (9th Cir. 1963) ("The use need not be the same as, nor one in competition with the original

7 use.  The question is, are the uses related so that they are likely to be connected in the mind of

8 a prospective purchaser"); see also *Brookfield Communications*, 174 F.3d at 1056 (holding that

9 because "both companies offer products and services relating to the entertainment industry

10 generally, and their principal lines of business both relate to movies specifically," there was

11 sufficient relatedness of goods to support a finding of likelihood of confusion); 4 J. Thomas

12 McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 24.24 (4th ed. 2006)

13 ("Goods are 'related' if consumers are likely to mistakenly think that the infringer's goods come

14 from the same source as the senior user's goods or are sponsored or approved by the senior

15 user").

16    Pom Wonderful asserts that its and Pur's products are related because both are

17 pomegranate-based or pomegranate-flavored beverages; both are sold in single serve containers;

18 and both are located in the refrigerated section of supermarkets.[51]  Although Pom Wonderful

19 concedes that Pur's beverage is a carbonated energy drink, while its product is juice, it asserts that

20 consumers would likely conclude both products are manufactured by Pom Wonderful because

21 other beverage companies sell both juice and energy drinks.[52]  Pur counters that the products differ

22 significantly and appeal to different consumers, because Pom Wonderful's beverage is a highly

23 caloric pure juice product, while Pur's beverage is a low-calorie energy drink infused with

24

25

26 ───────────────

27    [51]Motion at 17.

28    [52]*Id.*

26

vitamins.[53]  Pur argues that a strong degree of relatedness is required to support a finding of likelihood of confusion, because Pom Wonderful's rights are limited to the category for which it obtained the registration – i.e., fruit juice rather than energy drinks.[54]  Pom Wonderful counters that relatedness does not require that the same individuals consume both products.[55]  It notes that Pom Wonderful customers are likely to seek out Pur's product because they are health conscious, and Pur has positioned its product as a healthy, low-calorie, caffeine free alternative to other energy drinks.[56]

Pom is correct that goods need not be identical to be related for trademark purposes.  Nor must the parties be direct competitors to find that this factor weighs in favor of a likelihood of confusion.  Rather, the Ninth Circuit has "adopted a rather flexible approach to the whole notion of competition." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1212 (9th Cir. 2012).  It has concluded, for example, that two entities "are not properly characterized as non-competitors" where "both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically and are not as different as guns and toys or computer circuit boards and the Rocky Horror Picture Show." *Brookfield Communications*, 174 F.3d at 1056.  It has also held that two financial service companies, "[a]lthough . . . not direct competitors," offered services that were "sufficiently 'complementary' or 'related' that the public [was] likely to be confused as to the source of the services." *Am. International Group, Inc. v. Am. International Bank*, 926 F.2d 829, 832 (9th Cir. 1991).

Fruit juice and fruit-flavored energy drinks are "sufficiently complementary or related" that a reasonable consumer could connect them and be confused regarding the source of the products.

---

[53]Opposition at 19.

[54]*Id.* at 18.

[55]Reply at 17.

[56]*Id.* at 18.

Both Pom Wonderful's juice and Pur's energy drink are pomegranate-flavored single serve beverages that are often sold in the same chain of supermarkets.[57]  Courts have found that energy drinks are sufficiently similar to other types of beverages for purposes of this *Sleekcraft* factor. See *Hansen Beverage Co. v. Cytosport, Inc.*, No. CV 09–0031–VBF (AGRx), 2009 WL 5104260, *9, 12 (C.D. Cal. Nov. 4, 2009) (concluding that energy drinks and high-protein beverages were related despite differences in their effect on the consumer, nutrients, ingredients, consumers, and uses).

Indeed, courts have found that products that are more dissimilar than fruit juice and fruit-flavored energy drinks are related for purposes of the *Sleekcraft* analysis.  See, e.g., *Dep Corp. v. Opti-Ray, Inc.*, 768 F.Supp. 710, 714-15 (C.D. Cal. 1991) (finding that hair care products and sunglasses were sufficiently related because they "travel in the similar trade channels and they are both 'impulse' items.  Additionally, it is not uncommon for manufacturers of cosmetic and hair care products to offer merchandising items such as sunglasses under the same trademark.  Some popular cosmetics and hair care trademarks which are licensed for use on sunglasses include SEA & SKI, PIERRE CARDIN, VALENTINO, PALOMA PICASSO, LIZ CLAIBORNE and GANT").  Given that some companies sell both juice beverages and energy drinks, a reasonable consumer who knows that Pom Wonderful is a fruit juice company could conclude that it also sells energy drinks.  See *Under Armour, Inc. v. Body Armor Nutrition, LLC*, No. JKB–12–1283, 2013 WL 5375444, *1 (D. Md. Aug. 23, 2013) (noting that a company had pending registration applications for both energy drinks and fruit beverages); *Cintron Beverage Group, LLC v. Depersia*, No. 07–3043, 2009 WL 884480, *9 (E.D. Pa. Apr. 1, 2009) (noting that a company sold both fruit drinks and energy drinks).  Accordingly, even if Pom Wonderful and Pur are not true competitors in the sense that a consumer need not choose between the goods they offer for sale, the beverages at

---

[57]Motion at 18.  The parties dispute whether both products are sold in the same section in the supermarket.  Pom Wonderful states that both products are sold in the refrigerated section; its evidence, however, shows only that Pur's products are sold in that section.  (Motion at 17; Vasseghi Decl., ¶ 9; *id.*, Exh. E.)  Pur denies that Pom Wonderful's products are sold in the refrigerated section; it too, however, adduces evidence showing only that its own products are sold in the refrigerated section.  (Opposition at 11; Hubbard Decl., Exh. 3.)

issue are sufficiently complementary that a consumer could connect them and mistakenly believe they come from the same source.

### c.    Similarity of the Marks

The "central element" of trademark infringement is likelihood of confusion, or "whether 'the similarity of the marks is likely to confuse customers about the source of the products.'" *GoTo.com*, 202 F.3d at 1205 (quoting *Official Airline Guides v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993)); *see also Perfumebay.com, Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) ("'The similarity of the marks will always be an important factor.  Where the two marks are entirely dissimilar, there is no likelihood of confusion,'" quoting *Brookfield Communications*, 174 F.3d at 1054).

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351.   When judging similarity, trademarks should be considered as they are encountered in the marketplace, taking into account the normal circumstances surrounding purchase of the type of goods they represent. *Id.*; *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 605-06 (9th Cir. 1987) ("[D]etermination of 'similarity' involves consideration of 'the marks and names in their entirety and as they appear in the marketplace,'" quoting *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980)); *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984), cert. denied, 469 U.S. 1188 (1985); *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 759 (9th Cir. 1978).

"Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 644 (7th Cir. 2001); *see also Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 47 (2d Cir. 2000) ("Our inquiry does not end with a comparison of the marks themselves.  Rather, in determining whether two marks are confusingly similar, we must 'appraise the overall impression created by . . . the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers'"); *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) ("In determining whether the two marks are similar, and therefore likely to provoke confusion among prospective purchasers, courts appraise 'the overall impression

created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers,'" quoting *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993)); *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, C 05-587 MHP, 2005 WL 701599, *5 (N.D. Cal. Mar. 23, 2005) ("In comparing the parties' marks, the court must focus on how each of the marks [is] perceived by the ordinary consumer in the marketplace, taking into account similarities in the marks' appearance and pronunciation as well as their respective definitions," citing *Brookfield Communications*, 174 F.3d at 1054, and *Dreamwerks Production Group*, 142 F.3d at 1131).

"Similarity of appearance between marks is really nothing more than a subjective 'eyeball' test." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:25 (4th ed 2013). "[W]hat is critical is the overall appearance of the marks as used in the marketplace, not a deconstructionist view of the different components of the marks." *Playmakers, LLC v. ESPN, Inc.*, 297 F.Supp.2d 1277, 1283 (W.D. Wash. 2003).

Pom Wonderful argues that its mark and Pur's mark are virtually identical.[58] It asserts that the only differences are that Pur's "pom" appears in lowercase letters, while Pom Wonderful's mark is in capital letters, and that Pur uses a "breve" about the letter "ŏ."[59] Pur highlights these differences, and adds that it uses "pŏm" only in conjunction with "pūr," and only at the bottom of the product label in small print.[60] It asserts that the product bottles are also distinct, because POM's container is two connected spheres, while Pur's container is a cylinder.[61]

Pur is correct that the manner in which the marks appear in the marketplace is distinct in important ways. First, although the spelling of POM and pŏm is the same, Pur places a breve over the "o," making the two companies' use of the word visually distinct. The fact that Pur uses

---

[58]Motion at 12.

[59]*Id.*

[60]Opposition at 11.

[61]*Id.* at 10-11.

lower case letters, while Pom Wonderful uses capital letters further distinguishes the two marks. Additionally, Pur uses "pŏm" in conjunction with its name – "pūr pŏm."[62]   This too makes the mark visually distinct from "POM."   Moreover, while POM is prominently displayed at the top of Pom Wonderful's bottle, "pŏm" appears in small print at the bottom of Pur's can; both its size and position are subordinate to "pūr."   These differences suggest that Pur's product is different than Pom Wonderful's, and that Pom Wonderful is not its source, as none of its trademarks include the word "pūr."   See *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 633 (9th Cir. 2005) ("Survivor makes a strong argument that because its mark is usually accompanied by the distinctive slogan 'outwit[,] outplay[,] outlast,' or a stylized graphic, the marks are dissimilar"); *EA Engineering, Science, and Technology, Inc. v. Environmental Audit, Inc.*, 703 F.Supp. 853, 857 (C.D. Cal. 1989) (finding no similarity between plaintiff's "EA" mark and defendant's "EAI" mark because, "[i]n regard to sight, while the two marks do share the letters 'EA' in common, the addition of 'I' to Defendant's 'EA' plus the use of its corporate name sufficiently distinguishes the two marks visually. . . .   [Also,] [c]ase law suggests that the addition of a company's full name to its logo serves to sufficiently separate itself from a competitor using a somewhat similar logo," citing *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980)); *Pignons S.A. de Mecanique v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981) (holding that two similar "Alpha" marks were not likely to be confused because one was used in conjunction with the name of the manufacturer and the identifying designation SX-70)).   While "POM" and "pŏm" are similar, Pur's mark – as encountered in the marketplace – is in lower case letters, has a breve above the "o", and it used in conjunction with the additional word "pūr."   It is thus visually distinct from Pom Wonderful's mark.

The marks are visually distinct in other ways as well.   First, the fonts used are substantially different.   Pom Wonderful employs a bulkier font, while Pur uses a thinner, sleeker font. Although Pom Wonderful has registered "POM" without any design elements as a trademark, in the only images of Pom Wonderful's products included in the preliminary injunction record, the

---

[62]*Id.*

31

"O" in "POM" is in the shape of a heart.  This further distinguishes the two marks.[63]  See *SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F.Supp.2d 425, 438 (S.D.N.Y. 2007) ("Here, both plaintiff and defendants use the word 'SLY.'  However, this fact alone does not make the marks similar for purposes of assessing confusion under this *Polaroid* factor.  Defendants' 'SLY' was always shown in block capital letters, whereas plaintiff often uses the mark in a 'feminine' italicized script or followed by the tagline 'Shoes . . . the Obsession.'  When viewed in context, the plaintiff's use of italicized script and the frequent addition [of other words] tend to differentiate the mark"); see also *One Industries, LLC v. Jim O'Neal Distributing, Inc.*, 578 F.3d 1154, 1163-65 (9th Cir. 2009) ("We agree with the district court that the two marks are visually dissimilar.  A key distinguishing characteristic of the 'Rounded O' mark is a prominent apostrophe, which the One Icon noticeably lacks.  The One Icon consists of 'two angular symbols . . . placed in such a way that a 'Z'-shaped space appears between the two,' while the 'Rounded O is clearly a letter 'O' with a prominent apostrophe and is slightly angled.' . . .  Although O'Neal and One Industries are direct competitors, we are persuaded that the marks do not look alike. . . .  Accordingly, we conclude that there is no likelihood of confusion in this case, and that the district court properly granted summary judgment to One Industries"); *M2 Software, Inc.*, 421 F.3d at 1082 ("M2 Software stresses that Madacy's M2 Entertainment mark was identical to its M2 mark in both sight and sound.  Madacy, on the other hand, argues that the two marks are not sufficiently similar because the 'M2' in Madacy's M2 Entertainment mark is highly stylized and conjoined with the 'Entertainment,' lacks the oval which appears around M2 Software's M2 mark, and is used in connection with other more distinctive marks like the Lakers or the NBA. . . .  The district court compared the marks and took into account the similarity of the sight, sound, and meaning of the two marks.  After considering (1) the addition of 'Entertainment' by Madacy, (2) the use of the mark 'interactive' in addition to M2 on M2 Software's CDs, (3) the use of other marks in addition

---

[63]See Opposition at 10; Motion, Exhs. B, C.  Pom Wonderful's exhibits include one image of "POMx TEA," which does not include the stylized heart-shaped "O," but which adds the letter "x" to the end of "POM."  This too distinguishes the mark from Pur's mark.  (Motion, Exh. C at 43.)

to M2 Entertainment on Madacy's CDs, and (4) the fanciful nature of M2 Software's M2 mark, the district court ruled that the third *Sleekcraft* factor weighed only very slightly in M2 Software's favor.  This ruling was not erroneous"); *Nautilus Group, Inc. v. Savvier, Inc.*, 427 F.Supp.2d 990, 996 (W.D. Wash. 2006) ("The font used to advertise the two marks on the internet and on the products themselves are distinct.  Bowflex's mark uses bold and authoritative letters, stretched like an arrow, and flanked by the bow-like outline of the letter 'B.'  In contrast, BodyFlex's mark uses forward-leaning cursive font with a light underlining swoosh. . . .  [T]he sight of the two marks does not give rise to confusion"); *Echo Drain v. Newsted*, 307 F.Supp.2d 1116, 1126 (C.D. Cal. 2003) (" In this case, the two marks look different and appear different in the marketplace. . . .  The two marks are presented with distinctive fonts.  Defendants predominantly present the Echobrain mark as if each letter has been stamped on the page, with the 'o' being stamped twice and the ink not completely filling in each letter").

Based on the record, moreover, it appears that the color scheme of the marks is different.  While the lettering of both marks is white, the center of the heart-shaped "O" in "POM" is filled with red, while "pŏm" is written entirely in white.  See *First Franklin Financial Corp. v. Franklin First Financial, Ltd.*, 356 F.Supp.2d 1048, 1051 (N.D. Cal. 2005) ("Defendant's use of a different color scheme ( i.e., purple, yellow and white contrasted with plaintiff's teal and black) also renders these two marks readily distinguishable in appearance").  This visual difference contributes to making the marks appear dissimilar.  See *Garcoa, Inc. v. PH Beauty Labs, Inc.*, No. CV 09–4859 AHM, 2009 WL 2489223, *4 (C.D. Cal. Aug. 10, 2009) (concluding that two marks were visually distinct because, *inter alia*, "Garcoa displays its mark in such a way that the 'o' in 'bio' rests in part on top of the 'I' in 'INFUSION,' but on PH Beauty's products there is no such overlap;" "the parties use different fonts: Garcoa's is elongated and PH Beauty's is more compact and sleek;" and "the parties use different colors to emphasize the 'bio' portion of their marks").

Despite these visual differences, however, the two marks have similar meanings, as each refers to pomegranate flavoring and/or ingredients.  In addition, although "pŏm" includes a breve, Pur had adduced no evidence that consumers pronounce "pŏm" differently than they do "POM."

See *E & J Gallo Winery v. Pasatiempos Gallo, S.A.*, 905 F.Supp.1403, 1412 (E.D. Cal. 1994) ("It is well-established that notwithstanding the rules of phonetics, there is no such thing as the correct pronunciation of a trademark. . . . Parties' intended pronunciations of their respective marks do not control their actual pronunciation by consumers" (internal citation omitted)).

Although the issue is a close one, ultimately the court concludes, based on the distinctive visual appearance of the two marks, that they are sufficiently distinct to tip this crucial factor against a finding of likelihood of confusion.[64]

---

[64]At the hearing, Pom Wonderful argued that this result limits the scope of its rights in its registered word mark "POM," and asserted that the court had not sufficiently considered Pom Wonderful's use of the word mark without the heart-shaped "O," e.g., in radio advertisements. There is no evidence in the record of such use, however, and the court thus cannot consider it. Even if there were, courts have held that visual dissimilarity can defeat an infringement claim, even where all other relevant factors all weigh in favor of the plaintiff. *Welding Services, Inc. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007) ("Visual comparison of the two logos shows that they are not similar. The WSI mark consists of stylized letters in an ordinary circle. The WTI mark consists of plain block letters with an orange 'swoosh' design, meant to convey rotational movement, wrapping around the middle of the letters. The words 'Welding Technologies, Inc.' appear below the letters. There is not the least possibility of confusing the two stylized logos. Overwhelming visual dissimilarity can defeat an infringement claim, even where the other six factors all weigh in favor of the plaintiff," citing *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1208 (11th Cir. 2004) (holding, in a case where all other relevant factors – strength of the mark, similarity of the products, use of identical marketing channels, intent to cause confusion, and actual confusion – weighed in favor of a finding of likelihood of confusion that the visual dissimilarity of the marks warranted the entry of summary judgment for the alleged infringer)).

When asked to cite evidence of the manner in which it uses the word mark "POM" without the heart-shaped "O," Pom directed the court to an advertisement attached to Adams's declaration. In the advertisement, the word "KA-POM!" appears in red block letters against a jagged white background and above an image of a Pom Wonderful juice bottle bearing the word "POM" with the heart-shaped "O." (Adams Decl. at 30.) To the extent Pom relies on this image to demonstrate that Pur's use of the word pŏm is likely to cause confusion with its use of the word mark "POM," the court finds the argument unavailing. The word above the bottle in the advertisement is not "POM" but "KA-POM"; there is no evidence that Pom has registered "KA-POM."

Assuming *arguendo* "KA-POM" is protected, it is not similar to pŏm under the Ninth Circuit's "sight, sound, and meaning" test. *Sleekcraft*, 599 F.2d at 351. As noted, "KA-POM" appears in thick, red block letters in the advertisement. The word "pŏm" is in a thinner, sleeker font, in white letters, and includes a breve over the "o." Moreover, "pŏm" appears below the

### d. Evidence of Actual Confusion

Evidence of actual confusion is not necessary to prevail on an infringement claim or to secure injunctive relief; it can, however, be persuasive proof that future confusion is likely.  See *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) ("[A]ctual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act"); *Rodeo Collection*, 812 F.2d at 1218 ("Evidence of actual confusion is strong evidence of likelihood of confusion, but it is not determinative"); *Levi Strauss & Co.*, 778 F.2d at 1360 ("The absence of evidence of actual confusion need not give rise to an inference of no likelihood of confusion"); *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir. 1990) (affirming the grant of an injunction for plaintiff despite the absence of evidence of actual consumer confusion); see also *Sleekcraft*, 599 F.2d at 352 (proof of actual confusion "is persuasive proof that future confusion is likely").

Pom Wonderful has adduced no evidence of actual past confusion between its products and those of Pur.  Although evidence of actual confusion is not required to secure injunctive relief and the lack of such evidence is not dispositive, this factor nonetheless weighs against a finding that

---

word "pūr" and a large Pur logo, which further distinguishes "pŏm" from KA-POM.  See *EA Engineering, Science, and Technology, Inc.*, 703 F.Supp. at 857.  Thus, the marks are not visually similar.  Nor do "KA-POM!" and "pŏm" sound similar, as the former includes the extra syllable "KA."  As respects meaning, "KA-POM!" appears to be a take-off on "kapow."  This is suggested not only by the word itself, but by the fact that it appears in a white bubble with a jagged border, reminiscent of those used in comic strips.  The word "kapow" is used in comic strips to signify a loud noise such as a bang or explosion, or a strong punch or swing that injures a person or destroys an object.  Pom Wonderful's use of "KA-POM" thus appears to suggest that its pomegranate juice packs a serious health punch; this is reinforced by the fact that the phrase "The Antioxidant Superpower" appears at the bottom of the advertisement.  Although inclusion of "POM" in "KA-POM" suggests that the beverage contains pomegranate, as Pur's use of "pŏm" does, the dominant meaning of "KA-POM" differs from the meaning of "pŏm."  Thus, the sight, sound *and* meaning of "KA-POM" is distinct from the sight, sound and meaning of "pŏm."

Because there is no evidence as to how Pom Wonderful uses the word mark "POM" without the heart-shaped "O," and because "KA-POM" and "pŏm" differ in sound, sight and meaning, the court is unable to conclude that the similarity of the marks favors a finding that Pom Wonderful will show there is a likelihood of consumer confusion.

Pom Wonderful will succeed on the merits of its trademark claim.

### e. Degree to Which the Parties' Marketing Channels Converge

The marketing channels factor requires the court to consider whether the predominant purchasers of the parties' goods are similar or different, and whether the marketing approaches used resemble each other.  See *Gray v. Meijer, Inc.*, 295 F.3d 641, 649 (6th Cir. 2002); see also *Frehling Enterprises, Inc. v. International Select Group, Inc.*, 192 F.3d 1330, 1338 (11th Cir. 1999) ("'Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception.' . . .  This factor takes into consideration where, how, and to whom the parties' products are sold," quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir.), cert. denied, 449 U.S. 899 (1980)).

The parties need not be in direct competition with one another for this factor to weigh in favor of a finding of likelihood of confusion.  Similarly, the parties' outlets and customer bases need not be identical; rather, some degree of overlap suffices.  *Frehling Enterprises*, 192 F.3d at 1339; see also *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 877 (Fed. Cir. 1992) ("An opposer need not establish the sale of both parties' services by the same vendor to show employment of the same trade channels. . . .  Rather, this factor covers 'similarity and dissimilarity of established, likely-to-continue trade channels.' . . .  This court does not limit channels of trade to identical stores or agents.  Rather a channel of trade includes the same type of distribution channel.  For example, this court has held channels of trade identical when products were sold under opposing marks in supermarkets and grocery stores across the country. . . .  An opposer does not have the burden to show sales of an infringing product by a specific chain of supermarkets or agents").

Pom Wonderful asserts that both products are single-serve beverages sold in supermarkets and convenience stores; ;it further contends that the beverages are sold in at least one overlapping supermarket chain.[65]  Pur counters that its products are not sold in convenience stores.[66]  Unlike

---

[65]Motion at 18; Adams Decl., ¶ 16.

[66]Opposition at 19-20; Hubbard Decl., ¶ 7.

Pom Wonderful, which spends tens of millions of dollars on advertising, Pur contends it has not advertised on television, in magazines, or in newspapers.[67]  While Pom Wonderful is the top seller of 100% pomegranate juice nationally, Pur asserts its products are sold in just 200 grocery stores in Nevada, Arizona, New Mexico, Texas, Utah, and Colorado.[68]  Pom Wonderful has adduced no evidence that its products and Pur's products are sold at the same stores; although it contends both products are sold at Albertson's supermarkets, it does not allege or adduce evidence that the same Albertson's supermarkets carry both products.  Compare *Hansen Beverage Co.*, 2009 WL 5104269 at *17 ("Plaintiff submits and demonstrates with photos that MONSTER MILK and MONSTER ENERGY are sold side-by-side in gyms, fitness centers, health food stores, GNC stores, specialty stores, and Internet websites").  Nor, apart from evidence that it is the top seller of pomegranate juice in Dallas, has Pom Wonderful demonstrated that it sells or has significant market share in the areas where Pur's beverages can be purchased.[69]  Pom Wonderful's evidence is thus insufficient to show that this *Sleekcraft* factor favors a finding that it will probably succeed in demonstrating a likelihood of consumer confusion. See *Adidas America, Inc. v. Calmese*, 662 F.Supp.2d 1294, 1299 (D. Or. 2009) ("[T]he only overlap that exists between its marketing channels and those of Defendant are primarily in the Phoenix, Arizona, area, and, therefore, Plaintiff contends this factor should weigh in its favor. Under *Survivor*, however, this factor weighs in favor of Defendant despite the fact that the geographic overlap in their marketing channels is minor").

Pom Wonderful also contends that both products are offered for sale on the Internet.[70]  Pur denies that it offers its energy drink for sale on the Internet,[71] and Pom Wonderful adduces no

---

[67]Opposition at 20.

[68]Opposition at 19-20; Hubbard Decl., ¶ 7.

[69]Motion at 4.

[70]*Id.* at 18; Adams Decl., ¶ 16.

[71]Opposition at 20; Hubbard Decl., ¶ 7.

1    evidence beyond a conclusory statement by Jeremy Adams, its senior director of marketing, that
2    Pur makes Internet sales .  Even had Pom Wonderful adduced significant evidence that Pur sells
3    on the Internet, this would not weigh strongly in favor of a finding of consumer confusion.  While
4    the Ninth Circuit has held that Internet sales can exacerbate the likelihood of confusion, see
5    *GoTo.com*, 202 F.3d at 1207; *Brookfield Communications*, 174 F.3d at 1057 ("the use of the Web
6    is a factor that courts have consistently recognized as exacerbating the likelihood of confusion"),
7    it has also observed that Internet marketing is entitled to little weight, see *Playboy Enterprises,*
8    *Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) ("PEI and the
9    advertisers use identical marketing channels: the Internet.  More specifically, each of their sites
10   appears on defendants' search results pages.  Given the broad use of the Internet today, the same
11   could be said for countless companies.  Thus, this factor merits little weight").

12          Given the fact that Pom Wonderful has not adduced evidence demonstrating that its goods
13   and Pur's goods are sold in the same brick and mortar stores, or any non-conclusory evidence that
14   Pur's products are sold online, the court concludes that the marketing channels factor does not
15   favor a finding of likely consumer confusion or probable success on the merits.

16                     **f.     Degree of Care Exercised by Consumers**

17          "It is generally assumed that consumers with expertise or who are buying expensive
18   products or services exercise a greater degree of care when doing so and are thus less easily
19   confused." *Edge Wireless, LLC v. U.S. Cellular Corp.*, 312 F.Supp.2d 1325, 1333 (D. Or. 2003)
20   (citing *Brookfield Communications*, 174 F.3d at 1060 ("What is expected of this reasonably
21   prudent consumer depends on the circumstances.  We expect him to be more discerning – and less
22   easily confused – when he is purchasing expensive items")).  By contrast, "[w]hen dealing with
23   inexpensive products, consumers are likely to exercise less care, thus making confusion more
24   likely." *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F.Supp.2d 1282, 1290
25   (C.D. Cal. 2001) (citing *Brookfield Communications*, 174 F.3d at 1060, and *E. & J. Gallo*
26   *Winery*, 967 F.2d at 1293).  "Differences in price between the two products also should be
27   considered in measuring product proximity." *Banfi Products Corp. v. Kendall-Jackson Winery,*
28   *Ltd.*, 74 F.Supp.2d 188, 197 (E.D.N.Y. 1999).

The parties have proffered evidence that the cost of their products is between $1.99 and $2.49.[72]  Courts have found the price of beverages costing only a few dollars supports a finding that consumers purchasing such products exercise a low degree of care.  See *Starbucks Corp. v. Lundberg*, No. Civ. 02-948-HA, 2005 WL 3183858, *12 (D. Or. Nov. 29, 2005) ("The coffee beverages sold by both parties in this action are low cost items, costing no more than a few dollars.  This fact supports a finding that consumers exercise a low degree of care when purchasing such coffee beverages"); see also *Hansen Beverage Co.*, 2009 WL 5104260 at *20 (the fact that beverages cost $2 to $4 each supported a finding that consumers would likely associate both drinks with the same source); *CytoSport, Inc. v. Vital Pharmaceuticals, Inc.*, 617 F.Supp.2d 1051, 1077 (E.D. Cal. 2009) (the fact that protein drinks cost $3 to $5 favored a finding of likelihood of confusion)*; CSC Brands LP v. Herdez Corp.*, 191 F.Supp.2d 1145, 1153 (E.D. Cal. 2001) ("Given that these beverages are sold in supermarkets and are low cost, the degree of care likely to be exercised by purchasers is minimal").  Accordingly, this factor weighs in favor of a finding of likely consumer confusion.

### g.    Defendants' Intent

Knowing adoption of a mark closely similar to one used by another is a basis for inferring intent to deceive.  See *Official Airline Guides*, 6 F.3d at 1394 ("When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public"); *Nutri/System, Inc.*, 809 F.2d at 606 ("When an alleged infringer knowingly adopts a mark similar to another's, the court examines his good faith and intent in developing and marketing it," citing *Sleekcraft*, 599 F.2d at 354, and *Carson Mfg. Co. v. Carsonite Int'l Corp., Inc.*, 686 F.2d 665, 671 (9th Cir. 1981), cert. denied, 460 U.S. 1052 (1983)); see also *Daddy's Junky Music Stores, Inc., v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 286 (6th Cir. 1997) ("[T]he use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying").

Pom Wonderful asserts that the fact that Hubbard answered its cease and desist letter within

---

[72]Motion at 18; Vasseghi Decl., ¶ 11; Adams Decl., ¶ 17; Opposition at 20.

15 minutes of receipt and declined to alter his packaging supports a finding of intent to deceive.[73] It also cites an infringement action filed by Pur Water Purification Products as further evidence of such intent.[74]  The court disagrees.  Pom Wonderful has adduced no evidence that Hubbard's quick response to the cease and desist letter is evidence of intent to deceive, rather than a belief that Pom Wonderful's position was meritless.  The court, moreover, declines to draw inferences from the filing of a separate lawsuit whose merits it cannot evaluate.[75]  Given the absence of any concrete evidence of Hubbard's intent to deceive – i.e., evidence as to why he elected to call his energy drink "pūr pŏm" – the court concludes that this factor weighs against a finding of likely consumer confusion.  See *Nutri/System, Inc.*, 809 F.2d at 606.

### h.    Likelihood That the Parties Will Expand Their Product Lines

"A '"strong possibility" that either party may expand [its] business to compete with the other will weigh in favor of finding that the present use is infringing.'"  *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 311 F.Supp.2d 1023, 1044 (D. Or. 2004) (quoting *Sleekcraft*, 599 F.2d at 354).  Mere speculation about future plans is insufficient; plaintiff must proffer concrete evidence of plans to expand into new product lines.  See *Surfvivor Media, Inc.*, 406 F.3d at 634; *E. & J. Gallo Winery*, 967 F.2d at 1293.

Pom Wonderful has adduced no evidence that either party has expansion plans.  Rather, it argues that Hubbard's failure to state in his declaration that he has no plans to expand suggests expansion is forthcoming.[76]  Pom Wonderful's attempt to shift its burden to Pur, and require Pur to disprove an intent to expand, is unavailing.  See *Surfvivor Media, Inc.*, 406 F.3d at 634 ("[Plaintiff's] complete inability to adduce any concrete evidence of expansion plans tilts this factor in favor of [Defendant]"); *M2 Software, Inc.*, 421 F.3d at 1085 ("[T]here is a need for 'a

---

[73]Motion at 15.

[74]*Id.*

[75]Hubbard, in fact, asserts that Pur Water Purification Products has dropped its case against him.  (Opposition at 18; Hubbard Decl., ¶ 13.)

[76]Reply at 19.

40

1    *strong* possibility of expansion into competing markets' for this factor to 'weigh[ ] in favor of a

2    finding of infringement," quoting *E. & J. Gallo*, 967 F.2d at 1293 (emphasis added)).  Pur,

3    moreover, disclaims any intent to expand its distribution.[77]  Because the record contains no

4    evidence that either party intends to expand its business to compete with the other, this factor

5    weighs against a finding of likelihood of consumer confusion.  See *Surfvivor Media, Inc.*, 406

6    F.3d at 634.

7                    **3.    Evaluation of the Factors**

8            "To prevail on the ultimate question toward which the *Sleekcraft* analysis is directed – the

9    likelihood of confusion of consumers – [plaintiff] must show sufficient evidence to permit a

10   rational trier of fact to find that confusion is 'probable,' not merely 'possible.'"  *M2 Software*,

11   *Inc.*, 421 F.3d at 1085 (citing *Murray v. CNBC*, 86 F.3d 858, 861 (9th Cir. 1996)).  As noted,

12   the factors should not be applied mechanically, but should be used as a guide in assessing the

13   likelihood of confusion.  See *Dreamwerks Production Group*, 142 F.3d at 1129; see also *Thane*

14   *Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002) ("The list of [*Sleekcraft*]

15   factors is not a score-card – whether a party 'wins' a majority of the factors is not the point.  Nor

16   should '[t]he factors . . . be rigidly weighed; we do not count beans," citing *Dreamwerks*

17   *Production Group*, 142 F.3d at 1129).

18          Applying the factors as *Dreamwerks* directs, the court concludes that on this record, they

19   do not demonstrate it is probable that Pom Wonderful will prove a likelihood of consumer

20   confusion.  The most important factor – the similarity of the parties' marks – weigh s against Pom

21   Wonderful.  See *M2 Software, Inc.*, 421 F.3d at 1082  ("The similarity of marks 'has always been

22   considered a critical question in the likelihood-of-confusion analysis,'" quoting *GoTo.com*, 202

23   F.3d at 1205); *EA Engineering, Science, and Technology*, 703 F.Supp. at 858 ("In weighing all

24   the factors relevant to a determination of the likelihood of confusion, the Court rules that Plaintiff

25   has not met its burden of showing the likelihood of confusion.  While Plaintiff's mark is strong

26   and Plaintiff offers the same services in the same markets as Defendant, the lack of evidence of

27   _____

28          [77]Opposition at 20-21; Hubbard Decl., ¶¶ 9-10.

bad faith, wrongful intent, and actual confusion coupled with the dissimilarity of the two marks and the sophistication of the clients militates against a finding of a likelihood of confusion"). While the sound and meaning of the marks is for the most part the same, their visual display in the marketplace is quite different and tips this most important factor against a finding of likelihood of confusion.

Additionally, only three of the relevant factors can be said to weigh in favor of a finding of likelihood of confusion – the conceptual and commercial strength of Pom Wonderful's mark, the relatedness of the goods at issue, and the degree of consumer care. The remaining factors weigh against a finding of likely consumer confusion. The dissimilarity of the marks, the absence of evidence of actual confusion or intent to deceive, weak evidence regarding the convergence of marketing channels, and the absence of any evidence of planned expansion of the parties' product lines all lead the court to conclude that it is not probable Pom Wonderful will be able to demonstrate a likelihood of consumer confusion.[78]

### C.    Irreparable Harm

In *Winter*, the Supreme Court held that the standard previously employed in the Ninth Circuit – that a "possibility" of irreparable injury sufficed to support entry of a preliminary injunction if plaintiff made a strong showing of likely success on the merits – was too lenient. It concluded the plaintiff must demonstrate that irreparable injury is "*likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis original); *American Trucking Associations*, 559 F.3d at 1052; see also 11A C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1, p. 139 (2d ed. 1995) (an applicant must demonstrate that in the absence of preliminary relief, she "is likely to suffer irreparable harm before a decision on the merits can be rendered"). Thus, following *Winter*, a plaintiff seeking a preliminary injunction must show that

---

[78]Pur asserts additionally that its use of "pŏm" is a classic fair use, and that this defeats Pom Wonderful's claim. (Opposition at 14.) Fair use is an affirmative defense to trademark infringement. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management*, 618 F.3d 1025, 1031 (9th Cir. 2010) (citing 15 U.S.C. § 1115(b)(4)). Because Pom Wonderful has not shown that it is likely to succeed on the merits of its trademark infringement claim, the court need not address whether Pur's use of "pŏm" is a protected fair use.

it will likely suffer irreparable harm if an injunction does not issue. *Winter*, 555 U.S. at 20; see *Johnson*, 572 F.3d at 1081 ("[P]reliminary injunctive relief is available only if plaintiffs [also] 'demonstrate that irreparable injury is likely in the absence of an injunction,'" quoting *Winter*, 555 U.S. 22).[79]

Even before *Winter*, the Supreme Court held in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), that the Federal Circuit had erred in adopting a categorical rule that injunctive relief is generally available once a patentee establishes infringement and validity. *Id.* at 392-94. Although *eBay* involved the entry of a permanent injunction, "it has been applied to preliminary, as well as permanent, injunctions, and has been read to limit the presumption of irreparable harm [based] solely upon the finding of infringement." *Hologic, Inc. v. Senorx, Inc.*, C 08-133 RMW, 2008 WL 1860035, *15 (N.D. Cal. Apr. 25, 2008) ("[I]t does not appear that presumption of irreparable harm should be extended to preliminary injunction applications involving patents"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1214 (C.D. Cal. 2007) (finding no presumption of irreparable harm in a copyright case); *Chamberlain Group, Inc. v. Lear Corp.*, C 05-3449, 2007 WL 1017751, *5 (N.D. Ill. Mar. 30, 2007) (citations omitted)); see also *Seitz v. Envirotech Sys. Worldwide Inc.*, CV H 02-4782, 2007 WL 1795683, *2 (S.D. Tex. June 19, 2007) (recognizing that *eBay* "clarified the standard for issuing a[ ] [preliminary] injunction in a patent case," and that now "[a] court cannot automatically issue an injunction based on infringement allegations," but must instead independently consider, *inter alia*, whether the movant "has suffered an irreparable injury"); *Torspo Hockey Intern., Inc. v. Kor Hockey Ltd.*, 491 F.Supp.2d 871, 881 (D. Minn. 2007) ("[Counter-claimant] argues that if it has established a likelihood of success on the merits, it is entitled to a presumption of irreparable harm. [It] cites various pre-2006 Federal Circuit cases to support its position. In light of the Supreme Court's

---

[79]As noted earlier, *Winter* requires that the plaintiff also show a likelihood of success on the merits. *Winter*, 555 U.S. at 20. Interpreting this standard, the Ninth Circuit has held that serious questions going to the merits and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if plaintiff shows there is a likelihood of irreparable injury and the injunction is in the public interest. *Alliance for the Wild Rockies*, 632 F.3d at 1135.

decision in *eBay*[ ], the Court finds that it may not presume that a patentee who is likely to succeed on the merits at trial will suffer irreparable harm in the absence of a preliminary injunction"); *Erico Int'l Corp. v. Doc's Marketing, Inc.*, No. CV 05-2924, 2007 WL 108450, *7 (N.D. Ohio. Jan. 9, 2007) ("In *Ebay*, the Supreme Court held that traditional principles of equity generally applied in determining whether it is appropriate to issue a permanent injunction *apply with equal force in patent cases*. As such, the Court instructed that the Federal Circuit cannot alter the traditional standard. While *Ebay* involved a permanent injunction specifically, the Court did not limit its holding to that context; the Court's reasoning likely applies with even greater force at the preliminary injunction stage" (emphasis original)); *Canon, Inc. v. GCC Int'l Ltd.*, 450 F.Supp.2d 243, 254 (S.D.N.Y. 2006) ("The Supreme Court's decision in *eBay*[ ] makes plain that the mere fact that the Patent Act describes 'the right to exclude others from making, using, offering for sale or selling the invention,' does not mean that an application for a[ ] [preliminary] injunction in a patent case is exempt from the 'traditional principles of equity.' Consistent with those equitable principles, the movant must demonstrate the likelihood of irreparable injury in the absence of a grant of the requested injunction" (citation omitted)).

Following *eBay* and *Winter*, the Ninth Circuit and several district courts in the circuit have concluded that it is no longer appropriate to apply a presumption of irreparable harm in trademark and copyright cases. *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011) ("[W]e conclude that our longstanding rule that [a] showing of a reasonable likelihood of success on the merits in a copyright infringement claim raises a presumption of irreparable harm is clearly irreconcilable with the reasoning of the Court's decision[s] and has therefore been effectively overruled" (citations omitted)); see *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 997-98 (9th Cir. 2011) (same); *7-Eleven, Inc. v. Dhaliwal*, No. 12–CV–02276–KJM–GGH, 2012 WL 5880462, *6 (E.D. Cal. Nov. 21, 2012) ("[T]he Ninth Circuit has stated in a more recent case that presuming irreparable harm was inappropriate . . . when considering a preliminary injunction in the copyright infringement context"); *Jacobsen v. Katzer*, 609 F.Supp.2d 925, 936 (N.D. Cal. 2009) (applying the same rule to a copyright plaintiff). See also *Maxim Integrated Products, Inc. v. Quintana*, 654 F.Supp.2d 1024, 1030 (N.D. Cal. 2009) ("Thus, a

plaintiff is no longer entitled to a presumption of irreparable harm on the ground that it has shown a likelihood of success on the merits"); *Nampa Classical Academy v. Goesling*, No. 09-cv-427-EJL, 2009 WL 2923069, *2 (D. Idaho Sept. 10, 2009) ("No longer are plaintiffs granted the presumption of irreparable harm upon a showing of a likelihood of success on the merits"); *Mortgage Electronic Registration Systems, Inc. v. Brosnan*, No. C 09-3600 SBA, 2009 WL 3647125, *8 (N.D. Cal. Sept. 4, 2009) (stating in a trademark infringement case that "the Supreme Court's decision in *Winter* has effectively eliminated that presumption"); *Gowan Co., LLC v. Aceto Agricultural Chemicals*, No. CV-09-1124-PHX-JAT, 2009 WL 2028387, *4 (D. Ariz. July 10, 2009) ("The Supreme Court's more recent decision in *Winter* and the Ninth Circuit's ruling in *American Trucking* further confirmed that irreparable harm should no longer be presumed," citing *Jacobsen*, 609 F.Supp.2d at 925).

It is not enough, moreover, that the claimed harm be irreparable; it must be imminent as well. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *Los Angeles Mem'l Coliseum v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980); see also *Amylin Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 456 Fed. Appx. 676, 679 (9th Cir. Oct. 31, 2011) (Unpub. Disp.) ("[E]stablishing a threat of irreparable harm in the indefinite future is not enough"); *California Dump Truck Owners Ass'n v. Nichols*, No. 11-cv-00384-MCE-GGH, 2012 WL 273162, *3 (E.D. Cal. Jan. 30, 2012) (quoting *Amlyin*).   Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. *Caribbean Marine Servs.*, 844 F.2d at 674 (citing *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir.1984)).

Applying these standards, "[a] plaintiff must do more than merely allege imminent harm. . . ; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs.*, 844 F.2d at 674 (emphasis original). To do so, it must proffer probative evidence that the threatened injury is imminent and irreparable. *Am. Passage Media Corp. v. Cass Communications, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (reversing the entry of a preliminary injunction because the movant failed to adduce evidence of irreparable harm); *Bell Atlantic Business Systems, Inc. v. Storage Tech. Corp.*, No. C-94-0235,

1994 WL 125173, *3 (N.D. Cal. Mar. 31, 1994) (denying a motion for preliminary injunction because the movant failed to adduce sufficient evidence of a threat of irreparable harm). Conclusory affidavits are insufficient to demonstrate irreparable harm. *Am. Passage Media Corp.*, 750 F.2d at 1473.

Pom Wonderful argues that in the absence of injunctive relief, it will be irreparably harmed because Pur's use of "pŏm" improperly connects its product to Pom Wonderful and causes consumer confusion. It also asserts that it lacks the ability to control the quality of Pur's product, and thus any quality or health-related issues concerning "pūr pŏm" may be attributed to it, damaging its goodwill and future sales. Finally, Pom Wonderful contends that Pur's ongoing use of "pŏm" decreases the distinctiveness of the POM brand.[80] It asserts that the risk that continued association with Pur poses to its reputation is particularly acute because of recent news reports linking the use and misuse of energy drinks to illness and death.[81]

As the court has detailed, Pom Wonderful has failed to demonstrate that it is likely to succeed on the merits of its trademark infringement claim. Because it is unlikely that Pom will be able to show consumer confusion, its arguments regarding the risk to its reputation as a result of potential problems with Pur's product are unavailing. Moreover, Pom Wonderful has adduced no evidence that Pur's energy drinks pose health risks, or are subject to misuse that could result in illness or death. In other words, it has failed to show that Pur's alleged infringement has caused, or will imminently cause, irreparable harm. Rather, its conclusory allegations of harm are speculative and fail to satisfy the standard of proof required to show irreparable injury. Consequently, Pom Wonderful has failed to demonstrate that the "extraordinary remedy" of preliminary injunctive relief is warranted. See *Munaf*, 553 U.S. at 689-90; *Am. Passage Media Corp.*, 750 F.2d at 1473.

**D.    Balance of Hardships and Public Interest**

"In each case, a court must balance the competing claims of injury and must consider the

---

[80]Motion at 19.

[81]*Id.* at 3.

effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U.S. at 542.  See also *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) ("In evaluating the balance of hardships a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises").  It must also "consider the public interest as a factor in balancing the hardships when the public interest may be affected."  *Caribbean Marine Servs.*, 844 F.2d at 674.

"The likelihood of confusion to consumers is [a] critical factor in our consideration" of harm to the public.  *Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 995 n. 5 (9th Cir. 2009).  "The public has an interest in avoiding confusion between two companies' products."  *Id.*  Where there is no finding of likelihood of confusion, however, "an injunction [ ] depriv[es] consumers of a choice of products."  *International Jensen*, 4 F.3d at 827. In the absence of a finding of likelihood of confusion, therefore, the public interest weighs against entry of an injunction.  Similarly, as there is no likelihood of confusion, it will not impose a significant hardship on Pom Wonderful to permit Pur to continue manufacturing and selling its product.  Pur, by contrast, has adduced evidence that an injunction will destroy its business.[82]  The "pūr pŏm" energy drink accounts for approximately two-thirds of Pur's overall inventory; each can has an expiration date of two years after manufacture, or in March and June of 2015.  An injunction that lasted the duration of the case might well render its product inventory unsalable.[83] As a result, the balance of hardships and the public interest weigh against granting a preliminary injunction.

---

[82]Opposition at 23; Hubbard Decl., ¶¶ 11-12.

[83]*Id.*

47

1

## III.  CONCLUSION

2          For the reasons stated, the court concludes that Pom Wonderful has not satisfied the

3  requirements for obtaining a preliminary injunction.  Its motion is therefore denied.

4

5  DATED: January 17, 2014

6                                                                    MARGARET M. MORROW
                                                                     UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28